**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF INDIANA**
**NEW ALBANY DIVISION**

| | | |
|---|---|---|
| JEREMEY J. SMITH, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | Case No. 4:11-cv-68-TWP-DML |
| | ) | |
| MICHAEL J. ASTRUE, Commissioner | ) | |
| of the Social Security Administration, | ) | |
| | ) | |
| Defendant. | ) | |

**ENTRY ON JUDICIAL REVIEW**

Plaintiff, Jeremey J. Smith ("Mr. Smith"), requests judicial review of the decision of the Defendant, Michael J. Astrue, Commissioner of the Social Security Administration (Athe Commissioner®), denying Mr. Smith's application for Disability Insurance Benefits ("DIB") and for Supplemental Security Income ("SSI").   For the reasons set forth below, the Commissioner's decision is **AFFIRMED**.

**I.   STATEMENT OF THE CASE**

On March 21, 2008, Mr. Smith filed an application for DIB under Title II of the Social Security Act, 42 U.S.C. ' 423(d), and for SSI under Title XVI of the Social Security Act, 42 U.S.C. ' 1382c(a)(3), alleging a disability onset date of January 1, 2007.   (R. at 14.)   Mr. Smith was 33 years old at the time of the alleged onset.   (R. at 88.)   After a hearing, an Administrative Law Judge ("ALJ") issued a decision on May 21, 2010, in which he found that Mr. Smith was not disabled at any time from his alleged onset date through the date of the decision.   (R. at 14.)   On April 27, 2011, the Appeals Council denied Mr. Smith≈s request for review of this decision (R. at 1-3), thereby rendering the ALJ's decision the Agency≈s final decision for purposes of judicial

review.   20 C.F.R. ' 404.981.   The Court has jurisdiction pursuant to 42 U.S.C. ' 405(g).[1]

## II.   STATEMENT OF FACTS[2]

### A.      Mr. Smith=s Testimony and Vocational Background

Mr. Smith was 31 years old on his alleged disability onset date and 34 years old on the date of the ALJ=s decision; he had a high school education through a GED.   (R. at 21-22, 71.)

Mr. Smith testified that he stopped working due to ongoing radiating back pain stemming from a 1999 motorcycle accident.   (R. at 74-75.)   He stated that he underwent back surgery in 2006, but it did not help and his pain worsened.   (R. at 74-75.)   Mr. Smith testified that Neurontin helped his pain, but indicated that he had not taken any pain medication for over one year because he had no insurance.   (R. at 75-78.)   He stated that he stopped getting pain management treatment in mid-2008 due to a disagreement with his doctor over medications.   (R. at 75-76.) Mr. Smith indicated that he occasionally worked construction for his brother in 2008 if his back pain was not too severe.   (R. at 77.)   Mr. Smith testified that he could sit for 30 to 45 minutes at a time; stand for 10 minutes at a time; and walk 200 yards.   (R. at 78.)   He watched television, tended to his personal care, and could not wash dishes.   (R. at 78-79.)   Mr. Smith felt depressed because he could not work and provide for his family.   (R. at 80.)

### B.      Medical Evidence

On April 8, 2006, Mr. Smith went to the emergency room with complaints of chest pain, a severe cough, and shortness of breath.   (R. at 190.)   He stated that his cough was so bad that he had not been able to smoke over the previous four days.   (R. at 190.)   A chest X-ray showed no

---

[1]   Mr. Smith appears *pro se* before the ALJ and is appearing *pro se* before this Court.   (R. at 69-70; Plaintiff=s Brief.)

[2]   Mr. Smith=s brief does not address the facts.   The Court finds that Defendant=s recitation of the facts in its brief fairly describes the record, with a few modest changes.   The Court has, therefore, substantially adopted the factual recitation from the Defendant=s brief, as well as certain parts of the Defendant=s arguments.

acute disease.   (R. at 191- 96.)   Mr. Smith's symptoms improved with two puffs from an inhaler. (R. at 191.)   He was diagnosed with a cough, chronic obstructive pulmonary disease (COPD), shortness of breath, and chest pain; prescribed an inhaler, steroid, and antibiotic; and instructed to follow up with his primary doctor if his symptoms did not improve within a few days.   (R. at 191.)

He returned one week later with complaints that he had difficulty sleeping while taking the steroid.   (R. at 197-98.)   He had an essentially normal computed tomography (CT) scan of his chest.   (R. at 199-201.)   He also had a normal spirometry.   (R. at 206.)   An attending doctor discontinued the steroid and prescribed Lortab for chest wall pain.   (R. at 198.)   He also prescribed Prilosec because Mr. Smith's symptoms suggested gastroesophageal reflux disease (GERD) as the cause of his discomfort and he had GERD by history.   (R. at 198.)   A chest x-ray taken six months later likewise showed a normal heart and lungs.   (R. at 239.)   A November 2006 CT scan of Mr. Smith's chest showed benign calcified granuloma and mild fibrotic density in Mr. Smith's lungs.   (R. at 241.)

In November 2006, John T. Mahan, M.D., surgically removed a herniated disc at the L5-S1 level of Mr. Smith's lumbar spine without complications.   (R. at 244-45, 272-79, 407-10, 430.)

In December 2006, Mr. Smith complained of chest pain.   (R. at 216-30.)   An echocardiogram was normal and showed only trace tricuspid valve regurgitation.   (R. at 216-17.) He also had a normal stress test.   (R. at 218.)   That same month, he complained of having increased worry, waking up scared, and being short with his kids.   (R. at 268.)   His primary care doctors diagnosed him with possible anxiety/panic attacks and prescribed Paxil and Seroquel.   (R. at 268.)   One month later, he reported that Seroquel made him drowsy but Paxil was helping.   (R. at 267.)

In January 2007, Mr. Smith complained of abdominal pain and a scan showed acute

gallbladder disease.   (R. at 231, 266.)   In February 2007, Mr. Smith complained to his primary care doctors that he still had panic attacks and that Paxil was not helping.   (R. at 266.)   The results of a February 2007 nerve conduction study showed possible chronic left L5 radiculopathy.   (R. at 235-36.)[3]   On February 6, 2007, an MRI of the spine with and without contrast was performed.   The impression included:

> 1.      Disc degeneration and bulge at L4-5 with a small posterior annular tear and a small central focal disc protrusion.
>
> 2.      Disc degeneration and bulge at L5-S1 with central focal disc protrusion. There is enhancing granulation tissue and a left laminotomy defect, surrounding the left S1 nerve root, and within the posterior aspect of the herniated disc on the left.

(R. at 240.)

In May 2007, Mr. Smith complained that his panic attacks were "bad again."   (R. at 263.) His primary care doctors prescribed Cymbalta.   (R. at 263.)   In July 2007, Mr. Smith reported that he could not afford Cymbalta.   (R. at 262.)

In July 2007, Mr. Smith=s gallbladder was surgically removed.   (R. at 237, 264.)

On October 19, 2007, Mr. Smith saw Clark B. Bernard, M.D. ("Dr. Bernard"), a neurologist, with complaints of lower back pain that were an "8 out of 10."   (R. at 245-50.)   He indicated that he had a discectomy at one level of his lumbar spine in 2005, but without any post-surgical benefit.   (R. at 245, 251.)   Mr. Smith reported that he had been taking pain pills for about two years, but had not seen a pain management or rehabilitation doctor.   (R. at 245.)   He reported no incontinence.   (R. at 245.)   Mr. Smith was self-employed with his own wrecker service and did mechanical work on cars.   (R. at 245.)   Dr. Bernard observed that Mr. Smith had only mild tenderness in his lower back and full muscle strength, normal reflexes, a negative

---

[3]  The note specifically states, AThe left peroneal nerve F-wave amplitude ratio is abnormal.   Consider a chronic left L5 radiculopathy.@   (R. at 235.)

straight leg raising test, and normal gait.  (R. at 246.)  He could heel-toe and tandem walk without difficulty.  (R. at 246.)  Dr. Bernard noted that Mr. Smith≛s February 2007 lumbar MRI showed degenerative changes and a disc protrusion.  (R. at 246.)  Based on Mr. Smith≛s complaints of chronic pain and long-term use of narcotic pain medications, Dr. Bernard recommended that Mr. Smith see a pain management doctor.  (R. at 246.)

One week later, Ramarao V. Pasupuleti, M.D. ("Dr. Pasupuleti"), of the Floyd Hospital Pain Institute examined Mr. Smith for his complaints of lower back pain radiating into his left leg. (R. at 251-53, 302-06.)  Dr. Pasupuleti observed that Mr. Smith was in significant distress due to pain; had significantly reduced range of motion and muscle spasms in his lower back, but otherwise normal range of motion; walked with an antalgic gait; heel- and toe-walked with pain; had decreased muscle strength, reflexes, and sensation in his lower left side; and had a positive straight leg raising test on the left side for radicular pain going down the left leg.  (R. at 252.)  He diagnosed Mr. Smith with evidence of lumbar scar tissue with clinical signs and symptoms of left-sided lumbar radiculopathy; administered the first of two planned series of steroid injections; prescribed Neurontin (R. at 253-56); and suggested that Mr. Smith would benefit from a spinal cord stimulator.

In November 2007, Mr. Smith continued to take Prilosec for GERD.  (R. at 258.)

On May 15, 2008, consulting psychologist Stephen Perry, Ed.D. ("Dr. Perry"), examined Mr. Smith.  (R. at 311-15.)  Mr. Smith reported that he applied for disability due to chronic, significant back and shoulder pain.  (R. at 311-13.)  He also reported that he was stressed and depressed because his wife and children had left him in December 2007, and he felt guilty and sad because he could not work and provide for his family.  (R. at 311-14.)  He lived alone, tended to his personal care, did simple chores like cooking and cleaning, and went to his father≛s home to

visit because he could not stand to be by himself.   (R. at 313.)   Dr. Perry observed that Mr. Smith had a blunted affect, but had logical thought, normal memory, with some impairment in short-term memory that might be secondary to emotional factors, normal simple concentration, and low average to average intelligence.   (R. at 311-14.)

He diagnosed Mr. Smith with major depression, single episode, severe without psychotic features, and a mild to moderate anxiety disorder NOS.   (R. at 315.)   He "strongly encouraged" Mr. Smith to seek mental health treatment (R. at 314) and gave Mr. Smith a fair prognosis and assigned him a Global Assessment of Functioning ("GAF") score of 50, indicating serious symptoms or limitations in functioning.   (R. at 315.)   Dr. Perry opined that Mr. Smith might have difficulty with daily attendance and persistence at tasks due to his pain and depression.   (R. at 314.)   But he also opined that Mr. Smith appeared capable of understanding, remembering, and carrying out simple to moderately complex instruction and could relate to and communicate effectively with others.   (R. at 314.)   Dr. Perry stated that, "He may be a candidate for Vocational Rehabilitation services as again I believe he is within normal limits for cognitive functioning." (R. at 314.)   Dr. Perry indicated that Mr. Smith's physical conditions may make it difficult for him to work, but specifically "defer[s] to physicians= determination" as to the physical aspects of Mr. Smith=s condition.   (R. at 314.)

One week later, consulting physician Richard Gardner, M.D. ("Dr. Gardner"), examined Mr. Smith.   (R. at 316-18.)   Mr. Smith claimed that he could walk about 100 yards, primarily due to breathing problems.   (R. at 316.)   Dr. Gardner observed that Mr. Smith had a mildly decreased range of motion in his lower back, but had normal range of motion in his neck and other joints; a negative straight leg raising test to 80 degrees; normal gait, balance, ambulation, and motor strength; and no sensory or reflex changes.   (R. at 317.)   He could heel-toe walk and fully squat.

(R. at 317.)  Dr. Gardner diagnosed Mr. Smith with status post lumbar disc surgery with no radiculopathy or impaired mobility on exam, and shortness of breath with a normal spirometry. (R. at 317-28.)

In May 2008, state agency reviewing psychologist Joseph Pressner, Ph.D. ("Dr. Pressner"), opined that Mr. Smith's mental impairments of a single episode of depression and anxiety disorder NOS moderately limited his activities of daily living and concentration, persistence, or pace and mildly limited his social functioning.  (R. at 329-45.)  He noted that Mr. Smith did not allege a mental impairment in his application for benefits and did not receive any mental health treatment. (R. at 345.)  Dr. Pressner indicated that Mr. Smith did report being depressed and unmotivated on his ADL form and that Dr. Gray prescribed Effexor.  (R. at 345.)  He noted that at that time, Mr. Smith=s wife had left him and taken the children.   (R. at 345.)

Dr. Pressner noted that Dr. Perry encouraged Mr. Smith to seek mental health treatment, but nevertheless opined that Mr. Smith could understand and carry out moderately complex tasks and relate adequately to others.   (R. at 345.)   Dr. Pressner gave weight to this opinion because it was consistent with the evidence and Mr. Smith=s own reports.   (R. at 345.)   However, he gave no weight to Dr. Perry=s opinion that Mr. Smith might have difficulty with daily attendance and persistence due to pain and depression because he cited them in terms of depression and Mr. Smith=s physical condition.   (R. at 345.)   Dr. Pressner cited Mr. Smith=s report that he quit his last job solely due to physical problems.   (R. at 345.)   Dr. Pressner indicated that Mr. Smith reported that he lived alone, could perform simple chores, tended to his hygiene, and got along well with others.   (R. at 345.)   Dr. Pressner concluded that Mr. Smith could engage in Asimple, routine, tasks when sufficiently motivated and required to do so.@   (R. at 345.)   Two months later, Dr. William Shipley, Ph.D., affirmed the opinion.   (R. at 355.)

On June 4, 2008, R. Bond, M.D., a state agency reviewing physician, opined that Mr. Smith could perform light work; never climb ladders, ropes, or scaffolds; and occasionally perform all other postural activities.   (R. at 347-54.)   He noted that although Mr. Smith had some spinal disorders in his lower back as evidenced by his MRI, his physical exams were essentially normal.   (R. at 352.)   He also noted that Mr. Smith reported that he had a wrecker service and did mechanical work on cars, which he did not mention on his application.   (R. at 352.)   Finally, Dr. Bond stated that Mr. Smith claimed that some of his limitations were caused by shortness of breath, yet he did not use any inhalers and had normal pulmonary function tests.   (R. at 352.)   On July 21, 2008, Dr. J.V. Corcoran, M.D., affirmed the opinion.   (R. at 356.)

On July 18, 2008, Mr. Smith reported to Dr. Pasupuleti that he had 40% to 50% relief with Percocet.   (R. at 358.)   He stated that he ran out of Zanaflex and Neurontin because he did not know that the pharmacy could call the doctor's office for refills.   (R. at 358.)   Mr. Smith reported that his medications made him more functional, decreased his pain, and caused no side effects. (R. at 358.)   He wanted to continue taking them and reported that Percocet enabled him to help his brother-in-law with construction work.   (R. at 358-59.)   Dr. Pasupuleti gave Mr. Smith instructions regarding the office's policies on refills, was given additional prescriptions for Percocet, Zanaflex, and Neurontin, and indicated he would see him again in eight weeks.   (R. at 358.)   The doctor's exam on that day did show muscle spasms, that "SLR was positive on the left side at 45 degrees for radicular pain going down the left lower extremity," and weakness (3/5) when compared to the right.   (R. at 360.)

On July 25, 2008, Dr. Pasupuleti discharged Mr. Smith from his care for failing to comply with his November 2007 long-term medication agreement.   (R. at 306, 357.)[4]   An August 2008

---

[4] Dr. Pasupuleti's records do not show, as Mr. Smith claims, that he stopped seeing Dr. Pasupuleti due to lack of

CT scan showed clear lungs and a normal heart.   (R. at 367.)

In February 2010, Mr. Smith went to the emergency room and reported falling and re-injuring his back.   (R. at 374.)   He reported that he was doing well with his lower back pain up until the fall two weeks earlier.   (R. at 374.)   X-rays showed no new acute fracture or subluxation.   (R. at 378.)   A March 2010 MRI of Mr. Smith=s thoracic spine showed mild degenerative changes at two levels.   (R. at 440.)   A March 2010 MRI of his cervical spine showed a small disc protrusion at one level, a bulging disc at another level, and disc dessication of varying degrees at four levels, but no stenosis (narrowing of the spinal disc space and canals).   (R. at 439.)   A March 2010 MRI of Mr. Smith=s lumbar spine showed a slight bulging disc at one level, and was "equivocal [as to] whether this [wa]s enough to be compromising the nerve root." (R. at 441.)   The MRI was otherwise considered "unremarkable."[5]   (R. at 441.)   An examination by a family practitioner, Curtis Thill, M.D., on March 20, 2010, contains no material information. (R. at 442.)

**C.**   **Medical Evidence Submitted with Mr. Smith=s Brief**

On January 6, 2011, approximately eight months after the ALJ=s decision, Nurse April Stewart and Dr. Steven Goldstein completed a form for the Indiana Family and Social Service Administration.[6]   (Plaintiff=s Brief, Ex. 1.)   In the form, Nurse Stewart indicated that Mr. Smith was a new patient and that he was not taking any medications.   (*Id.* at 5.)   She reported that upon examination the same day she filled out the form, Mr. Smith had reduced flexion in his lower back to 75 degrees, reduced strength in his left leg, and a limp in his left leg, but a negative straight leg

---

insurance and a disagreement over his medication.   (R. at 306, 357.)

[5] Contrary to Mr. Smith=s belief, all of these MRIs were before the ALJ, and the ALJ specifically cited to them in his decision.   (R. at 19-20.)

[6] It appears that Nurse Stewart completed the form, as her name is listed first as the name of the Aexamining physician.@   (Plaintiff=s Brief, Ex. 1 at 6.)

raising test, full strength in his right leg, full range of motion in his neck, normal reflexes, and full

arm strength.  (*Id.* at 4.)  Nurse Stewart opined that Mr. Smith had significant limitations in

almost all postural activities.  (*Id.* at 6.)  She reported that Mr. Smith stated that he could not

work due to chronic neck and back pain and that he had back surgery in 2007.  (*Id.* at 4.)  She

also reported that Mr. Smith stated that he was depressed.  *Id.*  Nurse Stewart indicated that there

were no medical reasons that would prevent the standard treatment for Mr. Smith's pain, but she

did not know if Mr. Smith's functional limitations would improve with such treatment.  (*Id.* at 2.)

She thought that his condition might be chronic.  *Id.*  Nurse Stewart diagnosed Mr. Smith with a

bulging disc in his neck and degenerative disc disease in his lower back; indicated that these

impairments began in 2007; and gave them both a poor prognosis.  (*Id.* at 3.)

### D.    Vocational Expert ("VE") Testimony

The ALJ asked the VE what work could be performed by someone of Mr. Smith's

background who could perform light work; required a sit-stand option every 30 to 40 minutes;

could not climb ladders, ropes, or scaffolds; and could occasionally balance, stoop, crawl, knee,

crouch and climb ramps or stairs.  (R. at 83-84.)  The VE testified that such a person could

perform the representative light, unskilled job of assembler (6,000 state jobs; 600,000 jobs

nationally).  (R. at 84.)  The VE also identified two representative sedentary jobs.  (R. at 84-85.)

### III.   <u>DISCUSSION</u>

Mr. Smith raises three issues in his Complaint (Dkt. 1) and in his brief (Dkt. 13).  They

are:  (1) that his combination of impairments met or medically equaled Listings 1.02, 1.04, and

12.04 (Plaintiff's Brief at 1-2); (2) that the ALJ's residual functional capacity ("RFC") assessment

failed to consider the totality of his impairments, including pain and the additional impairments of

COPD and digestive issues (*id.* at 2); and (3) that this Court should remand his case on the basis of

a January 6, 2011 opinion from Nurse April Stewart and Dr. Steven Goldstein.   (*Id.* at 2, Ex. 1.)

**Issue 1:**      **Does substantial evidence support the ALJ=s findings that Mr. Smith does not meet or equal a listed impairment?**

**A.      Listing 12.04**

Mr. Smith=s brief does not specifically argue that the ALJ should have found that he met such a listing.   In his Complaint, however, he states that, "[t]here was also no mention about my depression …. This is something that I feel is severe enough to be under medical care for.   I have been + have had sucicidal idelogies [sic].   I have felt hopeless since not being able to provide for myself + my children."   (Plaintiff's Complaint at 2.)   Out of an abundance of caution, the Court will assess Mr. Smith=s mental impairments.

The ALJ=s decision reflects that he considered Mr. Smith=s mental impairments at step two, but not at step three of the sequential evaluation process.   (R. at 15-18.)   At step two, the ALJ found that Mr. Smith=s mental impairments were not severe because they did not cause more than a minimal limitation in his ability to perform basic mental work activities.   (R. at 16-17.)   *See* 20 C.F.R. ' 404.1521(a) ("An impairment or combination of impairments is not severe if it does not significantly limit your physical or mental ability to do basic work activities.").

Specifically, the ALJ considered each of the three functional areas under paragraph "B" of Listing 12.00C and found that Mr. Smith had mild limitations in activities of daily living; social functioning; and concentration, persistence, or pace.   (R. at 14-16.)   The ALJ then found that Mr. Smith=s mental impairments were not severe.   *See* 20 C.F.R. ' 404.1520a(d); 20 CFR Part 404, Subpart P, App. 1 ("Appendix 1") (noting that an impairment causing no more than mild limitations in each of the three functional areas and no episodes of decompensation is not severe).

In so doing, the ALJ cited the opinions and examination results of consulting psychologist Dr. Perry and the state agency reviewing psychologists.   (R. at 16-18.)   The ALJ cited that

portion of Dr. Perry's opinion in which he opined that Mr. Smith might have difficulty with daily attendance and persistence at tasks due to his pain and depression, but he did not give it any weight because Dr. Perry was also including the effects of Mr. Smith's physical condition.   (R. at 314.) The state agency reviewing psychologists made the same observation.   (R. at 345.)   But Dr. Perry also opined that Mr. Smith appeared capable of understanding, remembering, and carrying out simple to moderately complex instruction and could relate to and communicate effectively with others.   (R. at 314.)   The ALJ gave this opinion great weight because it was consistent with the objective medical evidence.   (R. at 17, 314.)   This is consistent with the state agency reviewing psychologists' opinions, as they reached the same finding as the ALJ.   (R. at 17, 345.)

Despite agreeing with Dr. Perry⸗s opinion as to Mr. Smith⸗s concentration and finding that his opinion as to pace was more related to Mr. Smith's physical impairments, the state agency reviewing psychologists opined that he was "moderately" limited in concentration, persistence, or pace.   (R. at 329-45.)   The ALJ noted this but found only mild limitations.   (R. at 17.)   The ALJ also found that contrary to the state psychologists' opinions, Mr. Smith was mildly, not moderately, limited in activities of daily living.   (R. at 17.)   The ALJ found that Mr. Smith⸗s activities of daily living did not suggest any significant mental limitations.   (R. at 17.)   In so finding, the ALJ specifically noted that Mr. Smith lived alone, independently maintained his hygiene, did simple household chores, and got along well with other people.   (R. at 17, 345.) The state agency reviewing psychologists cited the same activities, and these activities do not reveal any significant limitations and likewise constituted substantial evidence supporting the ALJ⸗s finding that they showed only mild limitations in activities of daily living.   (R. at 17, 345.)

Dr. Perry assigned Mr. Smith a GAF score of 50.   Dr. Perry nevertheless opined that Mr. Smith appeared capable of understanding, remembering, and carrying out simple to moderately

12

complex instruction and could relate to and communicate effectively with others.   (R. at 314.) This Court recognizes that—as Defendant argues—"nowhere do the Social Security regulations or case law require an ALJ to determine the extent of an individual≤s disability based entirely on his GAF score." *Denton v. Astrue*, 596 F.3d 419, 425 (7th Cir. 2010) (citation omitted). Furthermore, the "GAF scale 'does not have a direct correlation to the severity requirements in [the Agency's] mental disorders listings.'" *McFarland v. Astrue*, 288 Fed. App≤x 357, 359 (9th Cir. 2008) (quoting 65 Fed. Reg. 50,746, 50,764-65 (Aug. 21, 2000)). *See also Wilkins v. Barnhart*, 69 Fed. App≤x 775, 780-81 (7th Cir. 2003) (the court rejected an argument that an ALJ erred by discounting claimant's GAF score of 40 in her evaluation).

Therefore, this Court concludes that substantial evidence does support the ALJ≤s conclusion that Mr. Smith≤s mental impairments were not "severe" and therefore did not meet a listing.   Even if the ALJ should have found Mr. Smith to have "moderate" restrictions of activities of daily living or maintaining social functioning or maintaining concentration, persistence, and pace (as suggested by the state agency psychologists) and should have considered Mr. Smith≤s mental condition to be severe, substantial evidence supports a conclusion that Mr. Smith failed to meet the requirements of Listing 12.04.   This is because none of the paragraph "B" criteria have been proven by Mr. Smith to show "marked" impairment of those same functions, as required by the listing.

## B.     Listings 1.02 and 1.04

At step three, the ALJ found that Mr. Smith≤s lower back pain did not meet or medically equal the requirements for Listings 1.02 or 1.04 because Mr. Smith≤s back pain did not manifest itself in any problems ambulating effectively and was not caused by nerve root compression, spinal arachnoiditis, or lumbar spinal stenosis, as required under these listings.   (R. at 18.)

Substantial evidence supports these findings, and Mr. Smith has not met his burden of showing otherwise.

When a claimant contends that he has an impairment that meets or equals a listed impairment, the burden is on him to show that it meets or equals all of the requirements of that listing. *See* 20 C.F.R. ' 404.1520 (Mr. Smith, not the ALJ, bears the burden of proving that his conditions meet or medically equal a listing); *Rice v. Barnhart*, 384 F.3d 363, 369 (7th Cir. 2004); *Maggard v. Apfel*, 167 F.3d 376, 380 (7th Cir. 1999). Mr. Smith argues that February 2007 and March 2010 MRIs of his lumbar spine show that he met or medically equaled the requirements for Listing 1.02 and 1.04. (Plaintiff=s Brief at 1-2; R. at 240, 253.)

To meet or medically equal the severity requirements of Listing 1.02A, a claimant must prove that he/she cannot "ambulate effectively," as defined under the regulations. *See* 20 C.F.R. Part 404, Subpart P, App. 1, ' ' 1.00B(2)(b), 1.02A. AIneffective ambulation@ is defined as Ahaving insufficient lower extremity functioning … to permit independent ambulation without the use of a hand-held assistive device(s) that limits the functioning of both upper extremities.@ 20 C.F.R. Part 404, Subpart P, App. 1, ' 1.00B(1) (emphasis added). There is no record evidence which reflected that Mr. Smith required an assistive device that limited the functioning of both upper extremities, such as two canes, a walker, or two crutches. The ALJ therefore reasonably found that Mr. Smith=s impairments did not meet or medically equal Listing 1.02A because they did not result in an inability to ambulate effectively, *i.e.*, an extreme limitation of the ability to walk as defined under the regulations. (R. at 18.)

Listing 1.04A requires evidence of a disorder of the spine (such as herniated nucleus pulposus, spinal stenosis, osteoarthritis, degenerative disc disease, facet arthritis, or vertebral fracture) resulting in compromise of a nerve root or the spinal cord with evidence of nerve root

14

compression characterized by neuro-anatomic distribution of pain, limitation of motion in the spine, and motor loss (atrophy with associated muscle weakness or muscle weakness alone) accompanied by sensory or reflex loss and, if the lower back is involved, a positive straight leg raising test.  *See* 20 C.F.R., Part 404, Subpart P, App. 1, ' 1.04A.  Listing 1.04C requires lumbar spinal stenosis resulting in pseudoclaudication with chronic nonradicular pain and weakness resulting in an inability to ambulate effectively.  *See* 20 C.F.R., Part 404, Subpart P, App. 1, ' 1.04C.  The ALJ found that Mr. Smith=s impairments did not meet or medically equal Listing 1.04 because the record contained no documentation of spinal stenosis, arachnoiditis, nerve root compression, or sensory or motor deficits.  (R. at 18.)

A March 2010 MRI of Mr. Smith's lumbar spine showed a slight bulging disc at one level, and was "equivocal [as to] whether this [wa]s enough to be compromising the nerve root."  (R. at 441.)  The MRI was otherwise considered "unremarkable."  (R. at 441.)  Thus, the evidence Mr. Smith cites was, at best, equivocal as to nerve root compromise and did not show that Mr. Smith=s impairments met or medically equaled the remaining requirements for Listing 1.04.  Dr. Pasupuleti=s October 2007 examination showed that Mr. Smith had significantly reduced range of motion in his lower back; a positive straight leg raising test on the left; and reduced strength, sensation, and reflexes in his left leg.  (R. at 252.)  But he indicated that Mr. Smith had radicular pain going down the left leg, and he diagnosed him with left-sided radiculopathy.  (R. at 252.)  Thus, although Dr. Pasupuleti noted decreased sensation and muscle strength, he did not find that Mr. Smith had nerve root compression, and he characterized Mr. Smith=s pain as radicular.  (R. at 252.)  Notably, Mr. Smith had a normal examination with Dr. Bernard one week earlier and only slightly reduced range of motion with no other deficits during a consultative examination with Dr. Gardner six months later.  (R. at 246, 316.)

Finally, the ALJ relied upon the medical sources of record in finding that none of them made findings equivalent in severity to the criteria of any listed impairment.  (R. at 17-18.)   The ALJ therefore reasonably found that Mr. Smith≈s impairments, alone or in combination, did not medically equal the requirements for any listing.  (R. at 17-18.)   Notably, the state agency reviewing physicians completed Disability Determination and Transmittal Sheets, which constituted substantial evidence as to the ALJ≈s finding of no equivalence.  (R. at 88-91.)   *See* SSR 96-6p (noting that the signature of a state agency medical consultant on a Disability Determination and Transmittal Form ensures that consideration by a physician designated by the Commissioner has been given to the question of medical equivalence at the initial and reconsideration levels of administrative review); *Scheck v. Barnhart*, 357 F.3d 697, 700 (7th Cir. 2004) (finding that disability forms completed by state agency physicians conclusively establish that a physician designated by the agency has given consideration to the question of medical equivalence); *Farrell v. Sullivan*, 878 F.2d 985, 990 (7th Cir.1989) (same).

Substantial evidence therefore supports the ALJ≈s step three finding.  The ALJ indicated what listings applied to Mr. Smith≈s impairments, and he found that the medical evidence, including the opinions of the record medical sources, showed that Mr. Smith≈s impairments or combination of impairments did not meet or equal the criteria of any of the applicable listings.  (R. at 16-18.)   Conversely, Mr. Smith has not met his burden of showing that he met or medically equaled all of the requirements for any medical listing.   *See* 20 C.F.R. ' 404.1520.

**Issue 2:**       **Was the ALJ≈s residual functional capacity ("RFC") assessment proper?**

Mr. Smith argues that the ALJ≈s RFC assessment did not consider the totality of his conditions, specifically including the degree of his pain and depression and his COPD condition and Adigestive issues.@  (Plaintiff's Complaint, && 3, 5.)  Mr. Smith also argues that he was

16

diagnosed with COPD.   (Plaintiff=s Brief at 2.)   However, an impairment cannot meet the criteria

of a listing based only on a single diagnosis.   (R. at 191.)   20 C.F.R. ' 404.1525(d).   Mr. Smith

consistently had normal X-rays, CT scans, and pulmonary function tests.   (R. at 191, 199-201,

216-18, 239, 241, 352.)   The ALJ did not err in failing to consider COPD in his RFC analysis.

Likewise, with respect to Adigestive issues,@ records show that Mr. Smith=s gallbladder was

removed in July 2007.   (R. at 237, 264.)   Mr. Smith also argues that his GERD was a severe

impairment that "cause[s] diarrhea and pain and makes it impossible for him to be depended

upon."   (R. at 237, 264.)   The ALJ, however, reasonably found that Mr. Smith=s GERD was not a

severe impairment because it did not cause more than a minimal limitation in his ability to perform

basic work activities.   (R. 16.)   The only evidence as to the severity of Mr. Smith=s GERD were

four treatment notes showing that he was treated for or complained of GERD (R. at 198, 258, 262,

364; *see also* R. at 260-79), and these notes indicate only that he was continually prescribed

Prilosec (R. at 198, 258, 364.)   Most importantly, Mr. Smith has not shown otherwise.   He

indicates that he is "currently being treated by a gastroenterologist with little to no improvement."

(Plaintiff's Brief at 2.)   However, he does not attach any additional records, and such records

would not have been before the ALJ in any event.   If Mr. Smith is claiming that his condition has

deteriorated since the ALJ's decision, this may be the subject of a subsequent application for

benefits, but it does not show that the ALJ erred in his RFC analysis.   No other medical evidence

addresses digestive issues; for that reason, the ALJ did not err by failing to consider the effect of

"digestive issues" in the RFC calculus.

As to Mr. Smith=s pain, the ALJ states:

> While the undersigned finds the claimant's allegations of pain at present to be fully
> credible, due to lack of additional findings confirming any further deterioration of
> the lumbar spine, the undersigned cannot assume that the claimant would not
> improve and therefore would not have a severe impairment expected to last a

continuous twelve month period. The extent of pain and functional limitations prior to the recent fall is not found to be credible based on the essential lack of treatment, and the lack of objective findings as discussed.

In the instant case, the evidence is not adequate to establish the existence of a condition, which could establish significant pain and limitation. The diagnosis and treatment of a damaged disc, does not equate to a finding of disability. *See, Blacha v. Secretary of HHS*, 927 F.2d 228, 230-31 (6th Cir. 1990); *Davis v. Secretary of HHS*, 915 F.2d 186, 188-89 (6th Cir. 1990). Back pain of totally disabling severity is typically accompanied by physical effects which are objectively observable. Evidence of muscle atrophy is one physical finding that can be typically associated with severe back pain.

After careful consideration of the evidence, the undersigned finds that the claimant=s medically determinable impairments could reasonably be expected to cause the alleged symptoms; however, the claimant=s statements concerning the intensity, persistence and limiting effects of these symptoms are not entirely credible and would not preclude light work as described above. In sum, the claimant is never described as disabled or unable to perform all work, has not sought on-going medical treatment since late 2008, and was considered improved when on medication. There is also evidence suggesting that the claimant is more active than alleged at the hearing, specifically, medical records which describe the clamant [sic] as working off and on as a mechanic and in construction. The undersigned is in no way implying that the claimant does not experience some limitations due to his impairments. However, the limitations alleged by the claimant that find support within the objective medical record have been accommodated for by the above residual functional capacity.

(R. at 20.) The standard for an ALJ=s evaluation of pain is most recently stated as follows:

First, the adjudicator must consider whether there is an underlying medically determinable physical or mental impairment(s)—i.e., an impairment(s) that can be shown by medically acceptable clinical and laboratory diagnostic techniques—that could reasonably be expected to produce the individual=s pain or other symptoms. The finding that an individual's impairment(s) could reasonably be expected to produce the individual=s pain or other symptoms does not involve a determination as to the intensity, persistence, or functionally limiting effects of the individual=s symptoms. If there is no medically determinable physical or mental impairment(s), or if there is a medically determinable physical or mental impairment(s) but the impairment(s) could not reasonably be expected to produce the individual=s pain or other symptoms, the symptoms cannot be found to affect the individual=s ability to do basic work activities.

Second, once an underlying physical or mental impairment(s) that could reasonably be expected to produce the individual's pain or other symptoms has been shown, the adjudicator must evaluate the intensity, persistence, and limiting effects of the

individual=s symptoms to determine the extent to which the symptoms limit the individual=s ability to do basic work activities.  For this purpose, whenever the individual=s statements about the intensity, persistence, or functionally limiting effects of pain or other symptoms are not substantiated by objective medical evidence, *the adjudicator must make a finding on the credibility of the individual=s statements based on a consideration of the entire case record.  This includes the medical signs and laboratory findings, the individual's own statements about the symptoms, any statements and other information provided by treating or examining physicians or psychologists and other persons about the symptoms and how they affect the individual, and any other relevant evidence in the case record.*  This requirement for a finding on the credibility of the individual=s statements about symptoms and their effects is reflected in 20 CFR 404.1529(c)(4) and 416.929(c)(4).  These provisions of the regulations provide that an individual's symptoms, including pain, will be determined to diminish the individual=s capacity for basic work activities to the extent that the individual=s alleged functional limitations and restrictions due to symptoms can reasonably be accepted as consistent with the objective medical evidence and other evidence in the case record.

SSR 96-7p (emphasis added; footnote omitted).   In this case, the ALJ=s articulation does—albeit minimally—meet this standard, and is not patently incorrect.

**Issue 3:**       **Is a sentence six remand appropriate in this case?**

Pursuant to Section 205(g) of the Social Security Act, this Court may remand a case back to the Commissioner to consider new evidence, "but only upon a showing that there is new evidence which is material and that there is good cause for the failure to incorporate such evidence into the record in a prior proceeding."   42 U.S.C. § 405(g).   This is known as a "sentence six" remand, since its operative language is from the sixth sentence in Section 205(g).   Mr. Smith alleges that his constant pain prevents him from even standing, sitting, or lying down for any extended period and that Nurse Stewart and Dr. Goldstein=s opinions—expressed in newly presented evidence—show that his "abilities are very limited."   (Plaintiff's Ex. 1 at 6.) However, this opinion was not before the ALJ at the time he rendered his decision.   A reviewing court may not reverse an ALJ's decision based on evidence which was never presented to the ALJ. *Micus v. Bowen*, 979 F.2d 602, 606 n.1 (7th Cir. 1992).   Such evidence should be considered only

for purposes of a sentence six remand.   *See Eads v. Sec'y of the Dep't of Health & Human Servs.*, 983 F.2d 815 (7th Cir. 1993).   Mr. Smith has not met his burden of showing that a remand pursuant to sentence six would be appropriate.   42 U.S.C. ' 405(g).

As a preliminary matter, several of the pages Mr. Smith submitted cannot be considered "new" because they are duplicate copies of records that were already before the ALJ.   Not only were these documents merely duplicate copies, they refer to pre-existing diagnoses and impairments, all of which were treated conservatively and none of which were found to be disabling by the ALJ or any record medical source.   *Jens v. Barnhart*, 347 F.3d 209, 214 (7th Cir. 2003) ("The report does not provide a new perspective on the information that was available to Jens before his hearing before the ALJ, and thus does not meet the newness requirement…."). Nurse Stewart and Dr. Goldstein=s opinions also refer to pre-existing conditions and do not provide a new perspective on the information that was actually before the ALJ.   (Plaintiff=s Brief, Ex. 1.)

In any event, even if this opinion could be considered new, remand under sentence six is not warranted here because Mr. Smith has not shown that this opinion was material.   Indeed, Nurse Stewart and Dr. Goldstein=s opinions are not material because it likely would not change the ALJ's decision.   *See Schmidt v. Barnhart*, 395 F.3d 737, 742 (7th Cir. 2005) (citation omitted) ("New evidence is material if there is a reasonable probability that the ALJ would have reached a different conclusion had the evidence been considered.").

Here, the ALJ's RFC finding limited Mr. Smith to light work with several additional restrictions, including a sit/stand option.   (R. at 18-22.)   On January 6, 2011, approximately eight months after the ALJ's decision, Nurse Stewart and Dr. Goldstein, who practices internal medicine, submitted a form opinion the same day that they saw Mr. Smith for the first time. (Plaintiff=s Brief, Ex. 1 at 5.)   In the form, Nurse Stewart indicated that Mr. Smith was a new

patient and that he was not taking any medications.  *Id.*  They therefore did not have any longitudinal relationship with Mr. Smith and were not spine specialists.  *See* 20 C.F.R. ' 404.1527(d) and (f); SSR 96-2p; *see also White v. Barnhart*, 415 F.3d 654, 658-59 (7th Cir. 2005) ("It is difficult to think of more appropriate factors than a physician=s specialty and familiarity with the patient and his medical history when determining how much weight to assign to his opinions.").

Moreover, although Nurse Stewart opined that Mr. Smith had significant limitations in almost all postural activities and gave him a poor prognosis, her opinion appeared to be based, at least in part, on Mr. Smith=s subjective report of complaints.  (Plaintiff=s Brief, Ex. 1 at 3, 6). "[M]edical opinions upon which an ALJ should rely need to be based on objective observations and not amount merely to a recitation of a claimant=s subjective complaints."  *Rice*, 384 F.3d at 371.  For example, she reported that Mr. Smith stated that he could not work due to chronic neck and back pain and that he had back surgery in 2007.  (Plaintiff=s Brief, Ex. 1 at 4.)  She also reported that Mr. Smith stated that he was depressed.  *Id.*  Notably, the results of Mr. Smith's examination did not support such restrictive limitations.  *Id.*  *See* 20 C.F.R. ' 404.1527 (noting that the opinions of non-treating medical sources are reviewed for such things as supportability and consistency with the other record evidence).  Mr. Smith had reduced flexion in his lower back to 75 degrees, reduced strength in his left leg, and a limp in his left leg, but a negative straight leg raising test, full strength in his right leg, full range of motion in his neck, normal reflexes, and full arm strength.  (Plaintiff's Brief, Ex. 1 at 4.)  For these reasons, this opinion cannot be considered material, as there is not a reasonable probability that it would change the ALJ=s decision.  *See Schmidt*, 395 F.3d at 742.

Finally, to the extent that Mr. Smith cites this opinion as evidence that his condition has deteriorated since the ALJ=s decision, this may be the subject of a subsequent application for benefits, but not a sentence six remand.   *See Getch v. Astrue*, 539 F. 3d 473, 484 (7th Cir. 2008).

## IV.   CONCLUSION

The ALJ in this case did not commit error, and Mr. Smith did not carry his burden to show that any of his conditions meet a listing.   The RFC determination found by the ALJ to apply to Mr. Smith is supported by substantial evidence.   The newly submitted documents are not "new and material evidence" requiring a sentence six remand.   Therefore, the final decision of the Commissioner of the Social Security Administration is **AFFIRMED**.   Final judgment shall be entered accordingly.

SO ORDERED.   09/19/2012

Hon. Tanya Walton Pratt, Judge
United States District Court
Southern District of Indiana

DISTRIBUTION:

Jeremy J. Smith
8251 East North Ridge Road
Milltown, Indiana   47145

Thomas E. Kieper
UNITED STATES ATTORNEY=S OFFICE
tom.kieper@usdoj.gov